# United States Court of Appeals
## For the First Circuit

No. 19-1247

DENISE ARRUDA,

Plaintiff, Appellee,

v.

ZURICH AMERICAN INSURANCE COMPANY,

Defendant, Appellant,

NSTAR ELECTRIC AND GAS BASIC ACCIDENT INSURANCE PLAN,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Stahl, and Lipez,
Circuit Judges.

Kristyn M. Kelley, with whom Allen N. David, Jane A. Horne, and Peabody & Arnold LLP were on brief, for appellant.
Mala M. Rafik, with whom Sarah E. Burns and Rosenfeld & Rafik, P.C. were on brief, for appellee.

February 24, 2020

**LYNCH**, **Circuit Judge**.  Zurich American Insurance Company ("Zurich") denied the claim of Denise Arruda ("Arruda") for death benefits following the death of her husband Mr. Joseph Arruda in a 2014 car accident.  Zurich concluded, after reviewing the extensive record, that his death was not independent of all other causes and that it was caused or contributed to by his pre-existing health conditions.  As such, Zurich concluded the death was not within the coverage clause of the policy and was within an exclusion to the policy.

Arruda sued under 29 U.S.C. § 1132(a)(1)(B), alleging that Zurich violated ERISA by unlawfully denying the insurance benefits.  Each party moved for summary judgment.  The district court entered summary judgment in Arruda's favor, holding that Zurich's decision was arbitrary and capricious, reasoning that the denial was not supported by substantial evidence.  Zurich appealed. We reverse the district court, holding that Zurich's decision to deny the claim was supported by substantial evidence.  We direct entry of summary judgment for Zurich.

I.

A.  The Accident

In May 2014, Mr. Arruda was 57 years old, employed as a sales executive by Northeast Utilities/NStar Electric and Gas, and covered under his employer's Basic Accident Policy (the "Policy")

issued by Zurich for accidental death or injury.  He designated his wife as the beneficiary for any death benefits.

On the morning of May 22, 2014, Mr. Arruda drove westbound on Route 9, a four-lane road in Hadley, Massachusetts, on his way to a work event at the University of Massachusetts in Amherst.  At 9:39 a.m. his car crossed all lanes of traffic, collided with a car traveling eastbound, then hit the curb, rolled over, and landed on its wheels on the opposite side of the road. Police and fire department officials, including paramedics, from Hadley and Amherst arrived within ten minutes.  Mr. Arruda was briefly alive following the accident, but quickly succumbed to his multiple injuries and was pronounced dead at the scene.

Arruda timely filed for accidental death benefits on June 3, 2014.

B.   The Terms of the Contract

Under Section XII of the Policy (General Policy Conditions), Zurich has "the discretionary authority to determine eligibility for benefits and to construe the terms of the plan."

Under Section V (Benefits), the Policy states that Zurich will pay benefits "[i]f an Insured suffers a loss of life as a result of a Covered Injury."  As defined in Section III (Definitions), a Covered Injury is "an Injury directly caused by accidental means which is independent of all other causes." (Emphasis omitted).

- 3 -

Under Section VII (General Exclusions), the Policy does not cover losses that are subject to one or more exclusions:

> A loss will not be a Covered Loss if it is caused by, contributed to, or results from . . . illness or disease, regardless of how contracted, medical or surgical treatment of illness or disease; or complications following the surgical treatment of illness or disease . . . [or] being under the influence of any prescription drug, narcotic, or hallucinogen, unless such prescription drug, narcotic, or hallucinogen was prescribed by a physician and taken in accordance with the prescribed dosage.

(Emphasis omitted).

C.    Information Which Zurich Reviewed

In response to Arruda's claim, Zurich hired CS Claims Group, Inc. ("CS Claims") to investigate and collect all records relevant to the claim. CS Claims assembled Mr. Arruda's pre-accident medical records from his primary care doctor, various specialists, two hospitals, and his pharmacy. Zurich later had these records examined by independent experts, including by a forensic pathologist, Mark L. Taff, M.D. Dr. Taff concluded that these medical records revealed that Mr. Arruda had suffered from twenty-seven medical conditions from 2004 until his death. As catalogued by Dr. Taff, the conditions evident from Mr. Arruda's medical records included, among others: obesity, chronic sinusitis, hypertension, a variant of hypertrophic cardiomyopathy (heart enlargement associated with arrhythmias and heart failure),

primary hyperaldosteronism, hypokalemia, a sedentary lifestyle, depression, anxiety, dyslipidemia, diverticulosis, insomnia, fatigue, paresthesia (tingling sensation in the peripheral nerves), a history of myalgias (muscle pain and weakness) and of bronchitis, kidney stones, and syncope (fainting spells).

The records also showed that in mid-January 2014, about four months earlier than the accident, Mr. Arruda had an episode in which he felt weak, vomited, and fainted. As a result, within a few days of the incident he underwent surgery and had an implantable cardioverter defibrillator ("ICD") placed in his chest. The ICD monitored his heart rate and rhythm and could administer electric shocks to restore normal heart rhythm if necessary.

Andrew W. Sexton, D.O., an employee of the Commonwealth of Massachusetts' Office of the Chief Medical Examiner, issued a death certificate on May 22, 2014 saying the cause and manner of Mr. Arruda's death were pending. Dr. Sexton also did the autopsy on May 23, 2014. Dr. Sexton apparently finalized the autopsy report on June 12, 2014 and concluded:

CAUSE OF DEATH: Hypertensive Heart Disease.

Contributory Factors: Upper Cervical Spine Fracture due to Blunt Impact.

MANNER OF DEATH: Accident (Driver Involved in a Motor Vehicle Collision with Rollover)

- 5 -

These conclusions apparently did not include toxicology and cardiac findings done after that date, although the report made reference to their existence.[1]  However, no amended autopsy report was ever found.

Dr. Taff later summarized the significant findings of the autopsy report as follows:

1. Hypertensive cardiovascular disease associated with cardiomegaly (an enlarged heart weighing 530g; normal hearts usually weigh no more than 420g), biventricular hypertrophy (thickened right and left ventricles), mild, non-occlusive (less than 30% luminal narrowing) arteriosclerotic triple coronary artery disease, moderate atherosclerosis of abdominal aorta, multifocal interstitial myocardial fibrosis (abnormal scarring of heart muscle) and an intact functioning cardiac pacemaker/ICD defibrillator implant.
2. Mild pulmonary edema (wet lungs due to an abnormal increase of fluid).
3. Multiple blunt force impact injuries of the head (multiple scalp bruises distributed about the head and eyelids), neck (fractured 1st cervical vertebra; dislocated 3rd and 4th cervical vertebra associated with a grossly normal appearing cervical spinal cord), torso (multiple (10) bilateral anterior rib and upper sternum (breast plate) fractures) and upper and lower extremities (multiple soft tissue bruises).
4. Obesity (5'11"/216 lbs.).
5. Benign prostatic hypertrophy (BPH) due to an enlarged prostate gland.

---

[1]  Like the district court, we decline "to read much into this discrepancy as such."  The latter two reports are part of the record before Zurich and must be considered when assessing whether Zurich had substantial evidence to support its decision.

6. Hepatomegaly (enlarged soft liver weighing 2,050g; normal liver weight is up to about 1,700g).
7. Diffuse light purple congestion of face, lips and mouth associated with petechial (pinpoint) hemorrhages of right and left lower conjunctiva (eyes) and lips.

During the autopsy, the ICD was surgically removed and sent to Boston Scientific, the manufacturer, for analysis.

Mindy J. Hull, M.D., also of the Massachusetts Medical Examiner's Office, completed a cardiac pathology report on January 12, 2015. The report found "mild coronary artery disease" and "focal interstitial fibrosis of [the] lateral left ventricle." It did not mention any evidence of an acute cardiac event.[2]

In conjunction with the Massachusetts Medical Examiner, the Town of Hadley, Massachusetts, on June 9, 2014 issued a death certificate with the same primary cause of death as in the autopsy report, "hypertensive heart disease."

Various reports written by first responders to the scene of the car accident were part of the record. A report completed by paramedics from the Amherst Fire Department on the day of the accident described the paramedics' efforts to save Mr. Arruda's

---

[2] A blood toxicology report was completed on July 30, 2014 by the Massachusetts State Police's Forensic Services Group. It showed that Mr. Arruda's blood had 17 ng/ml of Delta-9 THC (the primary active ingredient in marijuana) and more than 40 ng/ml of Delta-9 Carboxy THC, its inactive metabolite. While Zurich independently found marijuana to be a contributing cause to the death, we have no need to reach the issue and do not further discuss the marijuana evidence or the parties' disputes about it.

life and listed in the "Impressions" section "Primary: Cardiac Arrest" and "Secondary: Motor Vehicle Accident[,] Trauma." An Accident Report from the Hadley Police Department completed the day after the accident described basic information about the trajectory of the crash and recorded the contact information of six witnesses.

The Massachusetts State Police completed an ACISS Homicide/Death Report on August 25, 2014. It included information the police gathered from the witnesses, including that Mr. Arruda was briefly alive following the accident and was suffering from multiple injuries, including an obvious neck injury. Before the paramedics arrived, he "went into breathing distress and started to seize" before losing consciousness. Based on the interviews and preliminary autopsy reports, the State Police concluded that Mr. Arruda "experienced some type of medical episode while driving his vehicle."

The Massachusetts State Police also completed a "Collision Analysis and Reconstruction Section Collision Reconstruction Report" on February 28, 2015. The officer who wrote the report ruled out various causes for the accident, including poor road conditions, mechanical failure, engineering design flaws in the road, speeding, and other drivers' error. He concluded that Mr. Arruda "had suffered a catastrophic medical event which caused him to be unable to control his vehicle."

Zurich initially turned this material over to two independent medical doctors for review, and later to a third independent expert. The first was William W. Angell, M.D., whose credentials are not in the record. Dr. Angell submitted his opinion on July 6, 2015 in a short, two-paragraph statement which was not on official letterhead. Dr. Angell stated: "[I]t would be my opinion that Mr. Arruda experienced a cardiac event at the time of the accident which resulted in his death and that the death was not independent of an underlying medical condition as indicated in the autopsy report." He did not further explain what he meant by a cardiac event. He also did not explain his reasoning for this conclusion but did state he had reviewed the file documents, including the medical records, police reports, and Medical Examiner reports. Later in the claims process, Zurich tried to locate Dr. Angell but was not able to do so.

The second independent medical review for Zurich was completed on November 30, 2015 by Michael D. Bell, M.D., a board-certified specialist in both Anatomic and Clinical Pathology and Forensic Pathology, licensed in New York and Florida. Dr. Bell reviewed all of the medical and non-medical documentation. He was asked specific questions and answered them as follows:

> 1. Did the deceased die from an accidental bodily injury, independent of all other causes? If so, please list all injuries sustained.

The crash and his death were caused by his heart disease, whether it be due to hypertension or a variant of [hypertrophic cardiomyopathy]. However, based on the autopsy results, the decedent's C1 left posterior arch fracture was C3-C4 dislocation with soft tissue hemorrhage at the injury sites would be a contributory cause of death. He had a C1 left posterior arch fracture and C3-C4 dislocation with soft tissue hemorrhage at the neck injury sites. He did not have a visible spinal cord injury. While he had multiple scalp bruising, he did not have a skull fracture or cerebral, cerebellar or brainstem injury. He had bruising of his right arm, left hand, and both legs. The rib fractures and chest bruising was believed to be caused by resuscitative chest compressions.

2. <u>Was the death caused by, contributed to or the result of illness or disease? If so, please list all medical conditions contributing to death.</u>
The crash and his death were caused by his heart disease, whether it be due to hypertension or a variant of [hypertrophic cardiomyopathy]. He has been treated for hypertension since at least 2008 and it has been difficult to control. The most likely mechanism of his crash and death is a ventricular arrhythmia secondary to his heart disease. He also has hyperaldosteronism, which made controlling his blood pressure difficult. However, the decedent's C1 left posterior arch fracture and C3-C4 dislocation with soft tissue hemorrhage at the injury sites would be a contributory cause of death.

Based on all of this information, Zurich denied Arruda's claim in a letter dated December 8, 2015. Zurich relied on two different Policy clauses in its denial: the coverage grant was not triggered because the death was not "independent of all other causes" and the death was excluded from coverage because it was

"caused by, contributed to, or results from" an "illness or disease."  The letter specifically highlighted the independent medical reviewers' conclusions and the cause of death recorded on the death certificate as determined by the Medical Examiner.

Arruda timely appealed Zurich's determination on January 29, 2016.  As part of her appeal letter, she submitted a logbook from Boston Scientific that recorded the information Mr. Arruda's ICD captured about his heart's condition in the months leading up to the accident.[3]  The logbook has three references to the date of Mr. Arruda's death, May 22, 2014.  The first is that at 8:23 a.m. on May 22, 2014, seventy-five minutes before the accident, the logbook has an entry for a successful "rhythm ID update."  The second is an "alert" from 2:24 p.m., approximately four and a half hours after Mr. Arruda's death, saying "Ventricular Tachy mode set to value other than Monitor+Therapy."  The third is that the report says it was "created" on May 22, 2014.  The logbook has no record of the cessation of Mr. Arruda's heart occasioned by his death. Arruda did not submit anything to Zurich explaining how to interpret the logbook, including anything to explain what "rhythm ID update" means or the significance of seventy-five minutes between that reading and his death.

_____

[3] She also submitted a transcript of a workers' compensation hearing and a resulting settlement agreement under which the employer agreed to accept liability for Mr. Arruda's death and pay Arruda a lump sum settlement amount.

On August 24, 2016, Arruda supplemented her appeal with an independent medical review from Elizabeth A. Laposata, M.D., dated August 5, 2016, the first of two reports Dr. Laposata submitted in support of her claim. Dr. Laposata is with Forensic Pathology & Legal Medicine, Inc., of Providence, Rhode Island. She is the former Chief Medical Examiner for the State of Rhode Island and a Fellow of both the College of American Pathologists and the American Society for Clinical Pathology.

In her first August 5, 2016 report, Dr. Laposata's main conclusion was that Mr. Arruda did not experience "a natural death at the wheel" with a resulting collision. The purpose of this conclusion is unclear. Zurich's denial of benefits made no such assertion. Neither Dr. Angell nor Dr. Bell had stated that Mr. Arruda had experienced a natural death at the wheel. Indeed, Dr. Bell expressly acknowledged that a severely injured Mr. Arruda was alive when found after the accident.

Dr. Laposata's report also criticized the Medical Examiner's conclusions as "incorrect" and inconsistent with the death being "accidental," as the Medical Examiner's report had concluded. She opined that "Mr. Arruda's correct cause of death is neck injuries due to blunt force trauma in the circumstance of a motor vehicle . . . collision with rollover." As to the question of what had caused Mr. Arruda to crash, she stated: "The exact reason Mr. Arruda traveled across several traffic lanes and into

the other vehicle is unclear." She did note that "[o]nly seconds of distraction or inattention to driving would be needed for his car to move out of his lane of travel and into the far lane and impact the second vehicle." She did not opine on whether Mr. Arruda's pre-existing medical conditions either "caused or contributed to" the crash.

Dr. Laposata commented on the logbook in her August 5, 2016 report. She wrote that since the ICD "showed no abnormal heart rhythms recorded prior to the collision," the accident was not caused by "incapacitation by heart disease." She did not say explicitly that the absence of data showed that no abnormal heart rhythm had occurred between 8:23 a.m. and the later time of the accident. Nor did she explain the absence of a recording in the logbook of the cessation of the heartbeat at death. Arruda never submitted to Zurich any materials on proper interpretation of the logbook entries, or lack of entries.

In response to Arruda's appeal, Zurich sought a third independent medical review. It obtained a report dated January 16, 2017, apparently through a company named ExamWorks, from Dr. Taff. Dr. Taff is a forensic pathologist and clinical associate professor of pathology at Mount Sinai School of Medicine in New York City. He had over thirty years' experience as a practicing board-certified pathologist and had investigated dozens of fatal motor vehicle accidents. He stated that the opinions he gave "are

to a reasonable degree of forensic medical certainty" and were based on his over thirty years of experience in the field.

In reaching his conclusions, Dr. Taff stated he had reviewed and analyzed:

> the 450-page file containing the following documentary evidence: 1) Massachusetts Police Investigative/Motor Vehicle Crash reports; 2) Joseph Arruda's (JA) autopsy, toxicology, histology (microscopic examination of tissues), cardiac pathology and death certificate reports; 3) medical expert reports prepared by Drs. Elizabeth Laposata, Michael Bell and William Angell; 4) pre-mortem medical records of Joseph Arruda dated 2004 - 2014; 5) news clips regarding the fatal motor vehicle collision; and 6) testimonial transcripts of multiple witnesses.

In his January 16, 2017 report to Zurich, Dr. Taff ruled out several possible causes of the accident. Although Mr. Arruda had suffered from depression and anxiety, Dr. Taff ruled out suicide as a cause. He stated the State Police investigation did not reveal any vehicle or environmental factors that would have contributed to the crash. He noted that "[t]he issue of texting while driving was not addressed in the police final reconstruction report."

In response to the question "Was the accident caused by, contributed to or resulted from an illness or disease (cardiac event/heart disease)?", Dr. Taff answered:

> The accident was caused by several possible pre-existing illnesses or diseases, singly or in combination, including: a) cardiac

- 14 -

arrhythmia resulting from pre-existing heart disease (hypertensive cardiovascular disease or a variant of hypertrophic cardiomyopathy); b) an adverse drug reaction for medications prescribed for pre-existing illness or heart disease; c) prescribed heart medication-related blood pressure problems; d) electrolyte imbalance (e.g. cardiac arrhythmias related to low blood potassium levels due to primary hyperaldoasteronism) [sic]; e) muscle weakness related to low blood potassium levels due to primary hyperaldoasteronism [sic]; f) complications of undiagnosed sleep apnea resulting in falling asleep behind the wheel; and g) temporary or intermittent cardiac pacemaker failure.

Before giving the conclusion, he explained the basis for it:

Although JA died from multiple bodily injuries sustained in a motor vehicle collision with several rollovers, it is uncertain why he suddenly and inexplicably veered off the westbound side of Rte 9 into oncoming traffic on the eastbound side. Based on JA's past medical history, there are several possible human factors, singly or in combination, that triggered the pre-impact phase of the motor vehicle collision, including a) long-standing heart disease (hypertension and variant of hypertrophic cardiomyopathy); b) medication-related problems for treatment of JA's pre-existing pathological conditions (sudden drop or increase in blood pressure); c) recent implantation of a cardiac pacemaker; d) hypokalemia (low blood potassium levels most likely due to pre-existing primary hyperaldoasteronism [sic] contributing to muscle weakness or a cardiac arrhythmia); e) chronic insomnia (falling asleep behind the wheel of a car); and f) breathing problems (e.g. chronic sinusitis and heavy snoring). Although JA was never diagnosed with sleep apnea, several of his pre-existing pathological conditions are known to cause irregular sleeping patterns, breathing

- 15 -

difficulties, chronic fatigue and obesity. Based on the circumstances, there is a good chance that JA fell asleep behind the wheel. The above pre-existing medical conditions, singly or in combination, could have set off an acute medical crisis that resulted in JA's sudden incapacitation behind the wheel of his vehicle. According to several reports, post-mortem analysis of JA's implantable ICD device showed no evidence of an ante-mortem arrhythmia. Based on the scene findings and eyewitness accounts, JA was still alive for a brief period of time after the collision and rollovers. There is no way to scientifically prove which human factor(s)/pre-existing medical condition(s) occurred during the pre-collision phase of the accident that resulted in fatal bodily injuries.

As this language makes clear, he did consider the analysis of the implanted ICD device in the logbook in reaching his conclusion.

In an addendum to her appeal, also considered by Zurich, Arruda replied to Dr. Taff's report with a supplemental report from Dr. Laposata dated April 14, 2017. It is this addendum which is now at the core of Arruda's argument. The second Laposata report stated:

There is no medical or scientific evidence to support a conclusion that Mr. Arruda's death due to injuries sustained in that motor vehicle accident was "caused by, contributed to, or results [sic] from illness or disease." The Insurance Company misrepresents the finding by Dr. Taff. Dr. Taff puts forward "several possible human factors" noting Mr. Arruda's medical conditions but concludes "There is no way to scientifically prove which human factor(s)/pre-existing medical conditions occurred during the pre-collision phase . . ." There is no evidence in the material examined that demonstrates to a

- 16 -

reasonable degree of medical certainty that any of Mr. Arruda's medical conditions caused or contributed to the accident. The interrogation of his cardiac defibrillator gives definitive proof that no cardiac arrhythmia or event preceded the accident. Additionally, Mr. Arruda never received a doctor's restriction that would limit his ability to operate a motor vehicle safely. Trooper Sanford speculates that Mr. Arruda "suffered a catastrophic medical event." He is clearly not qualified to make such a medical determination. Finally, the autopsy ruled out any other disease processes that would cause physical incapacitation at the wheel.

It is a serious error to conclude that the mere existence of medical diagnoses and speculation as to what <u>might</u> happen given these conditions equates with proof that a medical event did occur prior to the accident. Dr. Taff concludes that Mr. Arruda died from a broken neck, spinal cord injury and positional asphyxia, all injuries that occurred due to the motor vehicle accident. Mr. Arruda died from accidental bodily injury, independent of all other causes.

(Alteration in original).

Zurich's appeals committee upheld the denial of benefits to Arruda on May 11, 2017, identifying the same two Policy provisions and specifically stating reliance on the accident reconstruction report, the Commonwealth's autopsy report and death certificate, and Zurich's three independent medical reviews. It did not say it relied on the logbook. It acknowledged Dr. Laposata's differing opinion. The appeals committee stated that Arruda's claim would be denied because Mr. Arruda's death was not

- 17 -

"independent of all other causes" and was "caused by or resulted from" his pre-existing medical conditions.[4]

D.    Summary Judgment Reasoning of the District Court

The District Court concluded that Zurich's denial of benefits was arbitrary and capricious. It provided two different reasons for finding the denial arbitrary and capricious. The first was that it understood Zurich to have concluded that Mr. Arruda's "cause of death was heart disease." But, it reasoned, that conclusion was contradicted by Drs. Taff and Laposata and that Drs. Bell and Sexton "cite no evidence to support the conclusion that heart disease was the cause of death, other than the fact that Mr. Arruda had a history of heart disease." The second reason was that it understood Zurich to have concluded only that "Mr. Arruda's preexisting illness caused the accident," (emphasis added), which then caused his death. The court relied on language in Dr. Taff's opinion that he could not identify "which human

---

        [4]    The issue of which party has the burden of proof once an exclusion is invoked, given that both coverage and exclusions are at issue, is immaterial here as our conclusion would hold regardless. See Glista v. Unum Life Ins. Co., 378 F.3d 113, 131 (1st Cir. 2004) ("[T]raditional insurance law places the burden on the insurer to prove the applicability of exclusions such as the Pre-Ex Clause."). Regardless, under the arbitrary and capricious standard, "the issue is only whether there is substantial evidence in the record to support the administrator's determination." Arruda v. Zurich Am. Ins. Co., 366 F.Supp.3d 175, 182 n.1 (D. Mass. 2019). Zurich's decision is supported by substantial evidence as to both the Policy exclusions and the definition of a covered loss for coverage purposes.

- 18 -

factor(s)/pre-existing medical condition(s) occurred during the pre-collision phase of the accident that resulted in fatal bodily injuries." (Emphasis added). In the district court's view, the record "does not provide evidence beyond the mere existence of pre-existing illness." It agreed with Zurich that the logbook evidence was inconclusive and that it was not the basis for Zurich's denial.

The district court did not specifically focus on the Policy's "contributed to" language or the insurer's reliance in its denials on this language in referring to both the Policy and the medical evidence. Nor did the court focus on the reasons stated in the denial letter. Zurich's May 11, 2017 denial letter says that there was medical evidence that the accident was "contributed to" by pre-existing medical conditions or "was caused by or resulted from illness [and] disease." In the letter, Zurich cited Dr. Taff's conclusion that "Mr. Arruda died as the result of accidental bodily injuries but they were contributed to by multiple pre-existing illnesses or diseases."

This timely appeal followed.

II.

A.   Standard of Review

We review a district court's grant of summary judgment de novo. D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011).

- 19 -

Where, as here, the plan administrator is explicitly given discretionary authority by the terms of the Policy, we ask whether its decision is arbitrary and capricious or an abuse of discretion. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989); Doe v. Standard Ins. Co., 852 F.3d 118, 123 (1st Cir. 2017). That is, we must defer where the "decision is reasonable and supported by substantial evidence on the record as a whole." McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015). "Substantial evidence" is "evidence reasonably sufficient to support a conclusion." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). Indeed, in Doyle, this court cited to an administrative law case that used the sufficiency of the evidence standard in administrative law for guidance on how to determine what arbitrary and capricious means in the ERISA review context. Id. (citing Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)). Moreover, "[s]ufficiency . . . does not disappear merely by reason of contradictory evidence." Id. The job of a court is not to decide the "best reading" of the policy, O'Shea v. UPS Ret. Plan, 837 F.3d 67, 73 (1st Cir. 2016), but rather, to evaluate whether Zurich's conclusion was "reasonable." Colby v. Union Sec. Ins. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 62 (1st Cir. 2013).

Under this deferential standard, we hold that Zurich's decision was reasonable, supported by substantial evidence, and not arbitrary and capricious or an abuse of discretion.

B.  Pre-Existing Medical Conditions as a Contributing Cause of Death

The descriptions in the record before Zurich of the causes that contributed to Mr. Arruda's death were all consistent that his crash was caused, at least in part, or was contributed to by his pre-existing medical conditions.  Taking all of these materials and medical opinions "as a whole," McDonough, 783 F.3d at 379, Zurich's conclusion is not undermined because Dr. Laposata's opinion differed.  "[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."  Vlass v. Raytheon Emps. Disability Tr., 244 F.3d 27, 30 (1st Cir. 2001).

In fact, Dr. Laposata's first report was not inconsistent with Zurich's ultimate conclusion that Mr. Arruda's death was not "independent of all other causes."  She only stated that "Mr. Arruda was alive at the time of the crash" and did not die "a natural death at the wheel."  But that he was alive shortly after the crash was never at issue.

The thrust of Dr. Laposata's second report was her assertion that it was impossible to tell with "a reasonable degree of medical certainty" that Mr. Arruda's pre-existing pathologies

contributed to his having the accident which resulted in his death. But Zurich could reasonably rely on Dr. Taff's opinion "to a reasonable degree of forensic medical certainty" that that is exactly what happened. That Dr. Taff was reluctant to conclude further exactly which of the many pre-existing pathologies, singly or in combination with others, provided the precise contribution does not negate his ultimate conclusion. Rather, it reinforces the care with which he analyzed the data before reaching his conclusion. That care is also evidenced by his exclusion of two pathologies as contributions.

Nor was Zurich obligated to accept Arruda's view that the medical opinions on which Zurich relied were nothing more than speculation because they did not "provide evidence beyond the mere existence of pre-existing illness." Dr. Taff's report, in particular, carefully rules out other possible causes of the accident, gives a detailed account of Mr. Arruda's medical history, acknowledges potentially conflicting evidence, and comes to a reasoned conclusion.

Arruda offers no support for her contention that Dr. Taff needed to determine the precise mechanism or mechanisms by which Mr. Arruda's pre-existing conditions contributed to Mr. Arruda's car suddenly veering across multiple lanes of traffic and his fatal car accident. It is sufficient that Dr. Taff reached a firm conclusion to a reasonable degree of forensic medical

certainty, which was self-evidently reasoned, that some manifestation(s) of Mr. Arruda's pre-existing conditions caused him to have the accident that killed him. As is evident from the passages of Dr. Taff's report excerpted above, Dr. Taff showed a strong familiarity with the facts of the case and drew reasoned conclusions by applying his medical expertise.

Arruda and her expert criticize Dr. Taff's report, in particular, as engaging in speculation because of his use of language such as "mostly likely," "a good chance," and "could have." In leveling this criticism, they would have us ignore his conclusions given "to a reasonable degree of forensic medical certainty." Zurich could reasonably rely on that earlier language and conclude it did not undercut the conclusion. According to common dictionary definitions, "likely" establishes a probability. Likely, Black's Law Dictionary (10th ed. 2009) ("Apparently true or real; probable . . . [s]howing a strong tendency; reasonably expected"); Likely, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/likely (last visited Feb. 19, 2020) ("having a high probability of occurring or being true: very probable"); see also Glista v. Unum Life Ins. Co., 378 F.3d 113, 127 (1st Cir. 2004) (citing a dictionary definition of "treatment" while interpreting a policy clause in an ERISA case).

We have said that the arbitrary and capricious standard has some "bite," McDonough, 783 F.3d at 379, but that does not

mean that an insurer cannot rely on a doctor's conclusion because another doctor found his language not sufficiently precise.

We address our differences with the dissent.[5] The dissent relies heavily on the ICD logbook, but in doing so it misstates how Zurich used the logbook and what the logbook showed. Zurich did not rely on a particular interpretation of the logbook to deny Arruda's claim and it does not rely on one now to support its appeal. It is also untrue that the proper interpretation of the logbook is undisputed.

Zurich never rested on the logbook to support its denial. Indeed, Arruda's opening brief to this court argued that because Zurich had not relied on the logbook to deny benefits it could not later use the logbook entries to support its denial because Zurich had not done so earlier. In its reply brief, Zurich argued that it had not waived its right to argue that the arrhythmia logbook was inconclusive and repeated that it did not rely on the inconclusive logbook in denying benefits.

Zurich has explained why it did not rely on the logbook to support its denial of her appeal. The proper interpretation of the logbook, which contains many technical medical terms and

---

[5] The dissent mischaracterizes Zurich's reasons for denial. Zurich did not conclude that Arruda's claim was denied because of "the mere existence of [Mr. Arruda's] pre-existing illness." Neither Zurich nor any of its doctors so represented.

abbreviations, is contested. As the district court correctly held, "the logbook does not bear all the weight Mrs. Arruda seeks to place on it." Arruda maintains that the logbook must mean that the ICD recorded any and all heart irregularities in real time up through all events associated with the accident. Zurich reasonably interpreted the logbook as inconclusive, and that view is supported by the record. The logbook did not record anything after the last "rhythm ID update" seventy-five minutes before the accident, including by the fact that the logbook failed to record the stopping of Mr. Arruda's heartbeat on his death, therefore providing evidence it was not working properly.

The dissent, nonetheless, takes the position that Zurich was compelled to accept Dr. Laposata's understanding of the logbook. That is wrong for multiple reasons. That reading is not unrebutted in the record. We have already pointed out deficiencies in Dr. Laposata's opinion. The ICD captured only events which it was programmed to capture. There is no evidence anywhere in the record as to how the device was programmed.

Separately, two of Zurich's independent medical reviewers, Drs. Bell and Taff, both considered the ICD evidence and concluded that his death was caused or contributed to by illness or disease, even assuming favorably to Arruda that the ICD continued to record accurately. The dissent misses the point when it insists the only possible pre-existing medical condition which

- 25 -

could have contributed to the event was a cardiac arrhythmia or other cardiac event preceding the accident. Dr. Taff's opinion lists at least seven different possible medical conditions that, singly or in combination, caused or contributed to Mr. Arruda's death. One of those was "heart disease," a broader term than "heart attack" or "heart arrhythmia." Another was a "temporary or intermittent cardiac pacemaker failure." The other pre-existing conditions Dr. Taff specified were independent of heart attack or arrhythmia. Dr. Taff did not have to provide further explanation for how those conclusions are compatible with the logbook because there is no evidence the ICD captured all seven of the possible pre-existing causes set forth by Dr. Taff, and from the nature of the device, it is clear that it could not.

At most, Dr. Laposata's view, summarized in her addendum report, was that the ICD gives "proof that no cardiac arrhythmia or event proceeded the accident." She did not say that it gave proof that no pre-existing condition at all contributed to the accident. Indeed, Zurich was entitled to consider, in finding the logbook inconclusive, Dr. Laposata's earlier view that the ICD showed no episodes of "<u>sustained</u> ventricular tachycardia and no defibrillation discharges" and her expressed view that whatever caused the accident could have occurred within the time frame of mere seconds. (Emphasis added).

C.  Zurich Was Not, In the Face of Medical Evidence to the Contrary, Required to Accept Claimant's Evidence

Beyond this assessment of why the evidence supports the denial, Arruda's premise is that judges may find insurers' decisions as to benefits to be arbitrary even after the insurer relied on several independent experts and a record such as this.[6] Such a premise is in considerable tension with the standard of review we use, which requires deference to the insurer's decision under both Supreme Court and our circuit's precedent.[7]  See Firestone, 489 U.S. at 111; see, e.g., Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998).  Zurich's interpretation of the Policy is "by no means unreasonable and so must prevail."  Dutkewych v. Standard Ins. Co., 781 F.3d 623, 636 (1st Cir. 2015) (quoting Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir. 2009)).

The Supreme Court reminded us in Conkright v. Frommert, 559 U.S. 506, 517 (2010), of the importance of giving deference to

---

[6]  Arruda cites Buffonge v. Prudential Insurance Co. of America, 426 F.3d 20 (1st Cir. 2005), for the proposition that we should carefully scrutinize the medical opinions for the allegedly missing causation analysis.  We disagree that Buffonge aids her.  In Buffonge, we held that the insurer's decision was arbitrary and capricious because it relied on the opinion of an expert who had clearly misrepresented the opinions of other experts, an error that should have been obvious to the insurer on any reasonable review of the record.  426 F.3d at 28-29.  No such evidence of misrepresentation by any doctor is presented here; indeed, both Dr. Taff and Dr. Laposata relied on the same information.

[7]  We certainly may not, as the dissent proposes, develop our own theories not present in the record, like theorizing that Arruda may have fallen asleep because of stress at work, to find an insurer's decision arbitrary.

claims fiduciaries such as Zurich.  As the Court noted, such "[d]eference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation," "predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from de novo judicial review," and "uniformity, helping to avoid a patchwork of different interpretations of a plan . . . that covers employees in different jurisdictions." Id.

We are aware that a few other circuits, in reviewing whether something "contributed to" a covered loss under an insurance policy, have chosen to adopt a "substantial factor" test to aid their interpretation.  Under the "substantial factor" test, "a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss." Adkins v. Reliance Standard Life Ins. Co., 917 F.2d 794, 797 (4th Cir. 1990) (emphasis added) (quoting Colonial Life & Acc. Ins. Co. v. Weartz, 636 S.W.2d 891, 894 (Ky. Ct. App. 1982)); see also Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179, 1184 (11th Cir. 2004); McClure v. Life Ins. Co. of N. Am., 84 F.3d 1129, 1136 (9th Cir. 1996).[8]  The standard of review in this case, as all

_____

[8]    The Tenth Circuit has adopted a "plain meaning" approach instead of a "substantial factor" test.  See Pirkheim v. First Unum Life Ins., 229 F.3d 1008, 1010 (10th Cir. 2000).  Again, we rely on our own circuit law.

- 28 -

parties agree, is for abuse of discretion. In our view, the substantial factor test is in tension with our circuit law on the abuse of discretion test.

Further, as we have said, "our review of whether a plan administrator abused its discretion does not require that we determine either the 'best reading' of the ERISA plan or how we would read the plan de novo." D & H Therapy Assocs., LLC, 640 F.3d at 35. Our existing circuit law addresses the appropriate test for abuse of discretion review issues.

We also keep in mind the Supreme Court's admonition in Conkright that, in passing ERISA, Congress desired "to create a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." 559 U.S. at 517 (alterations and internal quotation marks omitted).

III.

Zurich's determination that Mr. Arruda's death was caused or contributed to by pre-existing medical conditions was supported by substantial evidence and was not arbitrary or capricious. We reverse and remand for entry of summary judgment for Zurich. No costs are awarded.


**-Dissenting Opinion Follows-**

- 29 -

LIPEZ, **Circuit Judge, dissenting**.  I agree with my colleagues on the legal principles that govern our review in this case.  We part ways, however, in applying that law to the record before us.  Although the majority reasons otherwise, Zurich cannot defend its conclusion that Mr. Arruda's heart disease or other pre-existing conditions caused or contributed to his car accident and death.  As I shall explain, the record inescapably reveals that Zurich denied Mrs. Arruda's claim for the reason aptly described by the district court: "the mere existence of [Mr. Arruda's] pre-existing illness."  Arruda v. Zurich Am. Ins. Co., 366 F. Supp. 3d 175, 186 (D. Mass. 2019).  That flawed logic produces an unjust result.

Because Zurich's decision is not supported by substantial evidence, my colleagues err in reversing the district court's judgment for Mrs. Arruda.  I therefore respectfully dissent.

## I.

As the majority notes, following Mr. Arruda's death, his ICD was removed and submitted to the manufacturer, Boston Scientific, for analysis.  The arrhythmia logbook report generated by Boston Scientific -- i.e., the record of cardiac "events" measured by the ICD -- shows no events after May 20, 2014, two days before the car crash.  The report also shows that a "Rhythm ID Update" was completed about an hour before the crash, at 8:23

a.m. on May 22. Faced with these facts, Zurich argues on appeal that the logbook functions in a particular way:

> The Logbook last updated at 8:23 a.m. on the day of the crash. The fact that the defibrillator was intact and working at the time of Mr. Arruda's death means that the Logbook does not update continuously in real time. The Logbook shows that Mr. Arruda did not experience a cardiac event before 8:23, but it is silent as to what happened in the hour leading up to the 9:30 crash. It does not even record the alleged seizure observed by witnesses after the crash or that Mr. Arruda's heart stopped beating shortly thereafter.

Zurich's assertion that the logbook did not record continuously in real time appears to be an attempt to support its suggestion that Mr. Arruda experienced a cardiac event at the time of the crash that had not yet been recorded. However, Zurich offers no evidentiary support for its depiction of how the ICD operated.

In fact, none of the medical experts describe the ICD as functioning in the way that Zurich argues. Nor do they place any significance on the absence from the ICD logbook report of Mr. Arruda's seizure or his heart stoppage. Four medical experts rendered opinions about the accident, but only three mention the ICD. And only one, Mrs. Arruda's expert, directly opines on the meaning of the logbook report.

To be specific, one of Zurich's experts, Dr. Bell, mentions the ICD itself, but not the logbook report. Dr. Bell notes that "the ICD was normally working and not activated prior

to the crash" based on State Trooper William McMillan's paraphrase of the autopsy results in an accident report. He then opines that Mr. Arruda's "crash and his death were caused by his heart disease." Another Zurich expert, Dr. Taff, states that, "[a]ccording to several reports, post-mortem analysis of [Mr. Arruda]'s implantable ICD device showed no evidence of an ante-mortem arrhythmia." Despite his acknowledgement that there was no evidence of an arrhythmia, Dr. Taff lists "cardiac arrhythmia resulting from pre-existing heart disease" as one of the "several possible pre-existing illnesses or diseases" that caused the accident.

Mrs. Arruda's expert, Dr. Laposata, authored two reports about the accident, the first before Dr. Taff rendered his opinion and the second afterwards. In her initial report, Dr. Laposata notes that "interrogation of the internal cardiac defibrillator did not show any abnormal heart rhythms prior to the accident." In her supplemental report, Dr. Laposata responds to Dr. Taff's findings with an explicit opinion that "[t]he interrogation of [Mr. Arruda's] cardiac defibrillator gives definitive proof that no cardiac arrhythmia or event preceded the accident."[9] There is no evidence in the record rebutting that statement.

---

[9] The majority criticizes Dr. Laposata for not explicitly stating in her first report that "the absence of data show[s] that no abnormal heart rhythm had occurred between 8:23 a.m. and the later time of the accident." Supra Section I.C. But that

Zurich concluded that Mr. Arruda's death is not covered under the Policy because it was "caused by, contributed to, or result[ed] from . . . illness or disease," i.e., Mr. Arruda's heart disease or some other pre-existing condition, and marijuana use. There is not substantial evidence in the record to support either factor.

## A. Illness or Disease

Mr. Arruda's autopsy did not reveal evidence of a heart attack or heart failure. Cf. Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179, 1181 (11th Cir. 2004) (undisputed cause of driver's death following car crash was "heart failure" where autopsy showed "complete blockage of one of the main arteries that supplies blood to the heart" and "no evidence of external injury"); Vickers v. Bos. Mut. Life Ins. Co., 135 F.3d 179, 180 (1st Cir. 1998) (undisputed that fatal car crash was caused by driver's heart attack where autopsy showed he had suffered an "acute coronary insufficiency"). In an ordinary case, the absence of such physical evidence may not be determinative because it does not rule out an

---

conclusion is implicit in her statement that interrogation of the ICD showed no abnormal heart rhythms prior to the accident. If Dr. Laposata understood the logbook report to be inconclusive as to what happened after the Rhythm ID Update was recorded, she would have said only that the ICD showed no abnormal heart rhythms prior to 8:23 a.m. Both of Dr. Laposata's reports reflect her consistent opinion that the logbook report shows no evidence of an arrhythmia prior to the accident itself.

arrhythmia.  But Mr. Arruda had an ICD, the very purpose of which was to measure cardiac irregularities.  The ICD logbook report is, therefore, a critical piece of medical evidence that bears upon the reasonableness of Zurich's decision.[10]

Mrs. Arruda submitted the logbook report to Zurich when she appealed from its decision denying benefits, and she later submitted the two expert reports by Dr. Laposata that discuss the report.  Yet Zurich did not mention the logbook report in its letter denying Mrs. Arruda's appeal.  Suggesting that somehow this disregard is a factor in Zurich's favor, the majority emphasizes that Zurich did not rely on the logbook report to deny Mrs. Arruda's claim for benefits.  Zurich's choice not to engage with a critical piece of evidence does not weigh in its favor. Recognizing the import of this failure, Zurich now argues belatedly that the logbook report is "inconclusive," a position that my colleagues insist is reasonable.  Supra Section II.B.  I disagree. Dr. Laposata is the only medical expert who actually interpreted the logbook report, and her unrebutted opinion is that the logbook report "gives definitive proof that no cardiac arrhythmia or event

---

[10] Although the district court expressed uncertainty about the meaning of the "Rhythm ID Update," it concluded that the logbook report "underscore[s]" the speculative nature of a conclusion that heart disease was the cause of Mr. Arruda's death.  Arruda, 366 F. Supp. 3d at 185 n.4.

preceded the accident."[11]  If Zurich believed that the logbook did not record cardiac irregularities in real time, and therefore it had doubts about Dr. Laposata's interpretation, it should have challenged her opinion with a second opinion.  Zurich was not entitled, however, to ignore the only medical expert interpretation of the logbook report in the record and now, on appeal, dismiss the significance of the logbook report with conjecture about how it works.

The absence of any evidence of a heart attack, heart failure, arrhythmia, or other cardiac event undermines the reasonableness of Zurich's denial of benefits on that basis. Nevertheless, the majority says that this focus on heart disease "misses the point," citing to Dr. Taff's list of "possible medical conditions that, singly or in combination, caused or contributed to Mr. Arruda's death."  Supra Section II.B.  It is enough, the majority says, that Dr. Taff reached a "self-evidently reasoned" conclusion that "some manifestation(s) of Mr. Arruda's pre-existing conditions" caused the accident.  Id.  What is a "self-

---

[11] The majority suggests that the opinions of Dr. Bell and Dr. Taff rebut Dr. Laposata's conclusion about the significance of the logbook report.  They do not.  Dr. Bell noted only that the ICD was "normally working and not activated prior to the crash," and Dr. Taff stated that "post-mortem analysis of [Mr. Arruda]'s implantable ICD device showed no evidence of an ante-mortem arrhythmia."  Yet both experts then concluded that Mr. Arruda's heart disease contributed in some way to the car crash, without explaining how those conclusions are compatible with the absence of any cardiac irregularity readings in the logbook.

evidently reasoned" conclusion?  One that relies on purported logic instead of evidence?  One that posits that a man with so many pre-existing conditions must have gotten into a sudden and unexplained accident because of those conditions?  That "reasoning" is nothing more than speculation.

The majority emphasizes that Dr. Taff rendered his opinion "to a reasonable degree of forensic medical certainty." Supra Section II.B.  His use of the phrase "reasonable degree of forensic medical certainty," the indispensable ultimate assertion in any testimony from a medical expert, has no talismanic significance.  Its probative force depends on the quality of the evidence underlying it.  Here that underlying evidence is strikingly feeble.  Dr. Taff lists a grab-bag of seven "possible" causes.  Included in the list are "cardiac arrhythmia," even though the ICD had not recorded a cardiac event, and "complications of undiagnosed sleep apnea resulting in falling asleep behind the wheel."  In fact, despite the absence of any medical history of sleep apnea (hence Dr. Taff's reference to "undiagnosed sleep apnea"), Dr. Taff suggests that Mr. Arruda fell asleep behind the wheel:

> Although [Mr. Arruda] was never diagnosed with sleep apnea, several of his pre-existing pathological conditions are known to cause irregular sleeping patterns, breathing difficulties, chronic fatigue and obesity. Based on the circumstances, there is a good

- 36 -

> chance that [Mr. Arruda] fell asleep behind
> the wheel.

This "good chance" conclusion discomforts the majority. My colleagues treat it as an unwelcome and irrelevant gloss on Dr. Taff's obligatory "reasonable degree of forensic medical certainty" observation. See supra Section II.B. They say that Zurich could ignore it in favor of Dr. Taff's more congenial and formally correct observation. But that "good chance" observation reveals the speculative nature of Dr. Taff's opinion about the relationship between Mr. Arruda's medical conditions and the accident.

The inescapable fact is that many healthy people fall asleep at the wheel while driving, and many sick people fall asleep at the wheel while driving for reasons that have nothing to do with their illness. Mr. Arruda left his home in Bristol, Rhode Island, around 6:30 a.m. on the day of the accident to drive to Amherst, Massachusetts, a distance of about 105 miles,[12] for a work event. At the time of the accident, Mr. Arruda was about ten minutes from the University of Massachusetts Amherst,[13] where the

---

[12] Driving Directions from Bristol, RI, to Amherst, MA, Google Maps, http://maps.google.com (search for "Amherst, MA"; then click "Directions" and enter "Bristol, RI" as the starting point).

[13] Driving Directions from 73 Russell Street, Hadley, MA, to the University of Massachusetts Amherst, Google Maps, http://maps.google.com (search for "University of Massachusetts Amherst" and click on the first result; then click "Directions" and enter "73 Russell Street, Hadley, MA" as the starting point).

- 37 -

event was being held.  Perhaps he had a sleepless night because he was worried about getting to the event on time.  Even if Dr. Taff is correct that Mr. Arruda fell asleep at the wheel (a speculative conclusion in itself), there is as good a chance that he fell asleep because of work anxiety as there is that he fell asleep because of undiagnosed sleep apnea.

My colleagues suggest that the parties' dispute comes down to a battle of the experts between Dr. Taff and Dr. Laposata. See supra Section II.B.  But that is not so.  Indeed, on perhaps the most essential point, the opinions of Dr. Taff and Dr. Laposata are not in conflict.  Dr. Taff acknowledges that "[t]here is no way to scientifically prove which human factor(s)/pre-existing medical condition(s) occurred during the pre-collision phase of the accident."  Dr. Laposata likewise observes that "[t]here is no medical or scientific data to conclude that the accident was caused or contributed to by Mr. Arruda's pre-existing medical conditions."  The two experts diverge, however, in their willingness to speculate about what happened despite the lack of supportive medical evidence.

Dr. Laposata does not purport to know what occurred prior to the accident.  Like Dr. Taff, she rules out several possibilities, including a heart attack or other "acute natural event incompatible with life" -- because the autopsy revealed no evidence of such an event -- and "incapacitation by heart disease"

-- because the ICD logbook report "showed no abnormal heart rhythms recorded prior to the collision." But she asserts that "[i]t is a serious error to conclude that the mere existence of medical diagnoses and speculation as to what <u>might</u> happen given these conditions equates with proof that a medical event did occur prior to the accident." I agree.

I recognize that Zurich does rely on other records, in addition to Dr. Taff's report, to support the determination that heart disease caused or contributed to Mr. Arruda's crash: the autopsy report and death certificate prepared by Dr. Sexton, the Massachusetts Collision Reconstruction Report completed by Trooper Sanford, and the two other medical expert reports written by Dr. Bell and Dr. Angell. Although this list gives the appearance of substantiality, the appearance does not survive scrutiny.

The front page of Dr. Sexton's autopsy report reads, in relevant part, as follows:

> CAUSE OF DEATH: Hypertensive Heart Disease.
>
> Contributory Factors: Upper Cervical Spine Fracture due to Blunt Impact.
>
> MANNER OF DEATH: Accident (Driver Involved in a Motor Vehicle Collision with Rollover)

The death certificate also states that the immediate cause of death was hypertensive heart disease.[14] But, as the district court noted,

---

[14] The copy of the death certificate reproduced in the administrative record is illegible. Zurich, however, stated in its letter denying Mrs. Arruda's claim for benefits that "[t]he

- 39 -

"Dr. Sexton's report was based solely on an examination of Mr. Arruda, and did not include any examination of his defibrillator device." Arruda, 366 F. Supp. 3d at 180. In addition, Dr. Taff points out "discrepancies" in Dr. Sexton's preparation of the autopsy report which "suggest that Dr. Sexton never took the . . . cardiac findings into consideration before finalizing his opinions about [Mr. Arruda]'s cause and manner of death." Dr. Sexton's cause of death determination, which was reached without consideration of all of the relevant medical evidence, is therefore unreliable.

Trooper Sanford states in his accident report that Mr. Arruda suffered from some kind of medical event that caused the crash. That opinion is baseless. As the district court observed, "[t]he record does not indicate Trooper Sanford has meaningful medical training in this area." Id. at 185. Indeed, Zurich appropriately concedes that the "State Police are not medical experts and their opinions could not be the basis for a determination that heart disease was the cause of death."

Dr. Bell opines in his medical expert report that Mr. Arruda's

> crash and his death were caused by his heart disease, whether it be due to hypertension or a variant of [hypertrophic cardiomyopathy]. However, based on the autopsy results, [Mr.

Death Certificate stated that the immediate cause of death was Hypertensive Heart Disease."

- 40 -

Arruda's] C1 left posterior arch fracture and C3-C4 dislocation with soft tissue hemorrhage at the injury sites would be a contributory cause of death.

He does not explain how or why he concludes that Mr. Arruda's heart disease caused the car crash and Mr. Arruda's death. It appears, however, that he relied on the flawed autopsy report.

Finally, the district court correctly found that Dr. Angell's report is "unreliable" because his "credentials are not contained in the record, and Zurich could not even identify [him]." Id. In addition, his brief conclusory opinion provides no basis for his findings.

In sum, the record lacks substantial medical evidence that bridges the gap between Mr. Arruda's pre-existing conditions, which he had been living with for years, and the cause of the fatal car accident. Without more, Zurich's decision amounts to a denial of benefits based on the mere existence of Mr. Arruda's pre-existing conditions. But it is not enough to reason that an indisputably sick man must have had the fatal car accident because of his sickness. Zurich's denial of benefits based on Mr. Arruda's medical conditions, singly or in combination, is not "reasonable and supported by substantial evidence on the record as a whole." See McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015).

## B. Marijuana

Zurich's decision to rely on the narcotics exclusion is unreasonable for similar reasons.  Dr. Taff's assertion that the marijuana in Mr. Arruda's system alone "would have impaired his ability to operate his motor vehicle" is undermined by his acknowledgement that "[r]esponses to marijuana vary from one person to another and precise and predictable behavioral and physiological reactions to the drug cannot be rendered."  As the district court correctly observed, "[t]here is no evidence in the record regarding how the marijuana in Mr. Arruda's system may or may not have impaired his driving and caused the car accident." Arruda, 366 F. Supp. 3d at 187.  Notably, the majority does not even attempt to defend Zurich's reliance on the narcotics exclusion.

### III.

In rejecting the decision of the district court overturning Zurich's denial of benefits, the majority questions the "premise" that "judges may find insurers' decisions as to benefits to be arbitrary even after the insurer relied on several independent experts and a record such as this," observing that "[s]uch a premise is in considerable tension" with the abuse of discretion standard of review.  Supra Section II.C.  There is no such tension here.  We have said many times that a standard of deference does not negate our obligation to ensure that

"substantial evidence" underlies the decisions of insurance plan administrators.  The district court met that obligation and so should we.  Quantity is not a proxy for substance.  Here, when the 450 or so pages[15] of documentation reviewed by Zurich are fairly examined, they are devoid of the substantial evidence required by law to support Zurich's denial of benefits.  I respectfully dissent.

---

[15] Dr. Taff noted that he reviewed a "450-page file" of documentary evidence when he prepared his report.