# United States Court of Appeals
## For the First Circuit

No. 14-1293

JOSEPH McDONOUGH,

Plaintiff, Appellant,

v.

AETNA LIFE INSURANCE COMPANY,

Defendant, Appellee.

BIOGEN INC. and BIOGEN INC. GROUP LONG TERM DISABILITY PLAN,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Barron, Selya and Stahl,
Circuit Judges.

Mala M. Rafik, with whom Socorra A. Glennon and Sean K. Collins were on brief, for appellant.
Stephen D. Rosenberg, with whom Caroline M. Fiore and The Wagner Law Group were on brief, for appellee.

April 15, 2015

**SELYA, Circuit Judge.** This case, brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, presents two issues. The first concerns the operation of an "own occupation" test within the definition of disability contained in a long-term disability (LTD) plan. The second concerns the operation of ERISA's penalty provision for late disclosure or non-disclosure of relevant plan documents. See 29 U.S.C. § 1132(c)(1)(B). After careful consideration, we vacate the district court's entry of summary judgment with respect to the termination of disability benefits and remand that issue for further consideration by the claims administrator. At the same time, we affirm the district court's imposition of a $5,000 penalty for the belated production of a plan document.

## I. BACKGROUND

Plaintiff-appellant Joseph McDonough worked in the information technology division of Biogen Idec, Inc., now known as Biogen Inc. (Biogen). In March of 2007, he assumed the position of Senior Analyst III, Systems Administration. This was a high-pressure job, with responsibility for providing support for the server infrastructure at Biogen locations around the world (24 hours a day, 365 days a year).

In November of the following year, the appellant suffered the sudden onset of right-side numbness, dizziness, and blurred vision. He was hospitalized and provisionally diagnosed with a

stroke.  Although this diagnosis could not be confirmed, some of his symptoms persisted and he did not return to work.

The appellant was eligible for disability benefits through a Biogen employee welfare benefit plan underwritten by defendant-appellee Aetna Life Insurance Company (Aetna).  Biogen serves as the plan administrator and Aetna serves as the claims administrator.  Withal, Aetna has plenary discretion to determine "whether and to what extent employees and beneficiaries are entitled to benefits."

A plan participant is disabled within the meaning of the plan on any day that the participant is "not able to perform the material duties of [his] own occupation solely because of: disease or injury; and [his] work earnings are 80% or less of [his] adjusted predisability earnings."  A participant's material duties are those "normally required for the performance of [the participant's] own occupation," so long as they "cannot be reasonably[] omitted or modified."  The plan defines a participant's "own occupation" as the occupation "routinely perform[ed]" by the participant at the time the disability began as that occupation is "normally performed in the national economy," rather than how it is performed for the employer.

The appellant successfully applied for LTD benefits under the plan, commencing May 23, 2009.  From that point forward, he and his health-care providers kept Aetna informed of his treatment and

-3-

prognosis.  Despite extensive therapy, the appellant continued to experience physical symptoms including sudden right-side weakness and loss of balance.  He also suffered from anxiety, panic attacks, and the like.  With this in mind, the appellant's primary care physician (PCP) referred him for mental health care in June 2009.  Some of his health-care providers suggested that his physical symptoms might be a reaction to stress associated with the demanding nature of his job.

In September of 2009, the appellant's PCP reported that the appellant was continuing to experience right-side weakness but had a "sedentary level of functionality" and "could work 5 days a week and 8 hours per day."  Based on this report, Aetna began to evaluate the appellant's continued eligibility for benefits.  Soon thereafter, two of the appellant's mental health providers jointly reported that he suffered debilitating panic attacks four to five times per week and projected that — due to a combination of these attacks, sleeplessness, and anxiety — the appellant would be unable to work for a year.

On October 29, 2009, Aetna informed the appellant by letter that his LTD benefits would be terminated as of October 31, 2009.  In Aetna's judgment, the appellant no longer met the plan's definition of disability.  This judgment was premised in large part on his PCP's conclusion that he could perform sedentary work 40 hours per week.  Aetna wrote off the contradictory report of the

appellant's mental health providers, concluding that it "lacked examination findings [sufficient] to support a functional impairment from a clinical standpoint."

The appellant challenged the benefits-termination decision through Aetna's internal appeals procedure. In support, he submitted medical records from physicians, mental health providers, and physical therapists, highlighting the symptomatology that (in his view) precluded him from satisfying the physical and cognitive requirements of his job. These symptoms included right-side numbness and weakness, which he said significantly impeded his fine-motor skills for typing and writing. They also included anxiety, sleeplessness, and frequent panic attacks, which he said would impair his ability to cope with the stressful and time-intensive nature of his position. Finally, he submitted a report by a vocational consultant who reviewed his medical records to assess his work capacity.

At this juncture, Aetna engaged four doctors, two specializing in occupational medicine and two specializing in psychology, to review the appellant's medical records and other documents submitted in support of his appeal. Aetna has conceded that all four of these doctors should be treated as Aetna employees rather than independent medical reviewers. In written reports, each of the four purposed to evaluate the medical evidence in detail. All of them concluded that the appellant was no longer

disabled, stating variously that the record "[f]ails to support functional impairment," that the appellant's "functional deficits would not preclude him from working in his own sedentary level occupation," that "from a psychological/psychiatric perspective, the claimant is not impaired from working. . . . in his own job or any job," and that the medical evidence "does not support a functional impairment, from a psychological perspective."  These reports uniformly listed among the documents reviewed, in what seems to be a boilerplate formulation, a job description, job analysis worksheet, and occupation description — yet none of the reviewers discussed either the demands of the appellant's position as it is normally performed in the national economy or how his symptoms would affect his ability to meet those demands.

In November of 2010, Aetna denied the internal appeal. In doing so, Aetna determined that "[f]rom an [o]ccupational [m]edicine perspective," the appellant did not suffer from the sequelae of a stroke; and that while he had some functional impairment, his functional deficits "would not preclude him from working in his own sedentary level occupation."  Aetna acknowledged, "[f]rom a psychology perspective," the reports of panic attacks and anxiety, as well as the reported likelihood that these symptoms would cause the appellant to miss more than four work days per month.  It concluded, however, that the medical records did not warrant a finding that any of the appellant's

mental health problems were of "a severity likely to have impaired his occupational functioning."  Aetna's denial letter did not discuss, directly or indirectly, the requirements of the appellant's position as it is normally performed in the national economy.

Dismayed by this decision, the appellant decamped to the federal district court, invoked ERISA, and sued for wrongful termination of benefits.  See 29 U.S.C. § 1132(a)(1)(B).  Although his suit named multiple defendants, the parties later agreed that Aetna was the only proper defendant with respect to the benefits-termination claim.

Early on, the appellant made written requests of both Aetna and Biogen, pursuant to 29 U.S.C. § 1024(b)(4), for "a complete copy of [his] plan, summary plan description, policy, and any and all attachments and amendments relating to his [LTD] Plan." Aetna responded by providing documents entitled "Your Group Plan" and "Summary of Coverage."  But as the deadline neared for filing summary judgment motions, Aetna disclosed for the first time the policy agreement between Aetna and Biogen.  Unlike the previously disclosed plan documents, the policy agreement contained language granting Aetna complete discretion over all benefits-eligibility decisions.  This language was important: it had the effect of altering the standard of judicial review.  See McDonough v. Aetna Life Ins. Co., No. 11-11167, 2014 WL 690319, at *12 (D. Mass. Feb.

-7-

19, 2014).  The appellant promptly amended his complaint to add a request for penalties for failure to produce all relevant plan documents within the statutorily prescribed time.  See 29 U.S.C. § 1132(a)(1)(A), (c)(1)(B).

In due season, the parties cross-moved for summary judgment.  The district court granted summary judgment for Aetna on the benefits-termination claim.  See McDonough, 2014 WL 690319, at *19.  With respect to the appellant's other claim, the court determined that a relevant document had been disclosed belatedly and assessed a $5,000 penalty against Aetna.[1]  See id.

## II.  ANALYSIS

The appellant advances two claims of error.  The first relates to the district court's finding that Aetna's benefits-termination decision is supportable.  The second relates to what the appellant regards as the skimpiness of the penalty assessed.  We address these claims of error sequentially.

### A.  Termination of Benefits.

In ERISA cases, an inquiring court must peruse the plan documents in order to determine the standard of judicial review applicable to a claims administrator's denial of benefits.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  A challenge to a denial of benefits is to be reviewed de novo "unless

---

[1] The parties agreed that any penalty imposed should be charged exclusively to Aetna (and not to Biogen).  See McDonough, 2014 WL 690319, at *19.

the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. But where the plan documents grant the claims administrator full discretionary authority, the decision is reviewed for abuse of discretion. See id. at 111; Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. LTD Plan, 705 F.3d 58, 61 (1st Cir. 2013). Because both trial and appellate courts are tasked to inspect the claims administrator's actions through the same lens, our review of the district court's approval or rejection of a benefits-termination decision is de novo. See Colby, 705 F.3d at 61 n.2.

In this case, the parties agree that, given the sweeping phraseology of the belatedly produced policy agreement, abuse of discretion review applies. A court that undertakes abuse of discretion review in an ERISA case must determine whether the claims administrator's decision is arbitrary and capricious or, looked at from another angle, whether that decision is reasonable and supported by substantial evidence on the record as a whole. See id. at 61. Although this is a deferential metric, it is not without some bite. See id. at 62 (noting that "there is a sharp distinction between deferential review and no review at all"); see also Conkright v. Frommert, 559 U.S. 506, 521 (2010). Here, moreover, abuse of discretion review has a special gloss. Aetna is the entity that both resolves benefits claims and pays meritorious

claims. As such, Aetna suffers from a structural conflict of interest. While the existence of such a structural conflict does not alter the standard of review, it is a factor that a court may draw upon to temper the deference afforded to the claims administrator's decision. See Colby, 705 F.3d at 62.

Moving from the general to the specific, the appellant contends that Aetna's termination of his LTD benefits constituted an abuse of discretion; that is, that the benefits-termination decision was arbitrary, capricious, and not supported by the record. Specifically, the appellant contends that Aetna failed to evaluate his documented functional limitations in light of the duties of his own occupation as it is normally performed in the national economy. He adds that Aetna conflated the "own occupation" standard with that of "any sedentary occupation," thereby giving short shrift to the cognitive demands of the appellant's own occupation. And, finally, he submits that the claims administrator mis-weighed the medical and vocational evidence.

The record contains a plethora of reports from a wide variety of physicians and mental health professionals.[2] These reports take different slants and, read in the ensemble, they do

---

[2] For a comprehensive and in-depth catalogue of the copious medical and vocational reports relating to the appellant's case, we refer the reader to the district court's meticulous opinion. See McDonough, 2014 WL 690319, at *2-9.

-10-

not at first blush paint a clear picture of either the extent or duration of the appellant's disability. As we explain below, however, there is a threshold issue here — and this appeal does not turn on what the medical evidence shows.

We begin with bedrock: an ERISA benefits determination must be a reasoned determination, and "[a] benefits determination cannot be 'reasoned' when the [claims] administrator sidesteps the central inquiry." Id. at 67. By the plain language of the plan at issue here, the key inquiry is whether the claimant is "able to perform the material duties of [his] own occupation" as "normally performed in the national economy." Thus, a reasoned determination of the existence of disability vel non requires, inter alia, a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy. See Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 618-19 (6th Cir. 2006). Only then can a claims administrator distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination of whether or not the claimant is disabled.

Viewed against this backdrop, Aetna's decision to terminate the appellant's LTD benefits was not a reasoned determination. None of the four internal reviewers upon whom Aetna relied compared the appellant's symptoms or impairments to any description of the physical and cognitive demands of his own

-11-

occupation <u>as that term is defined in the plan documents</u>.  Nor does the administrative record support an inference that Aetna itself made any such comparison.  While the record is rife with accounts of the appellant's medical and psychological symptoms, Aetna never took the obligatory step of assessing whether and to what extent (if at all) the appellant's impairments compromised his ability to carry out the material duties of his own occupation as normally performed in the national economy.

To be sure, some of the internal reviews as well as Aetna's letter denying the internal appeal made passing references to the appellant's "own occupation" or "own sedentary level occupation."  But these references were unaccompanied by any attempt to articulate the material duties of the appellant's own occupation as that occupation is normally performed in the national economy.  Both the reviewers' reports and the denial letter are silent as to the dimensions of the own occupation benchmark.[3]  On this opaque record, there is simply no way to tell whether the reviewers were applying a correct conception of the appellant's own

---

[3] Moreover, at least one of the reviewers drew in large part from the Social Security Administration's standards for complete disability — and never gave so much as lip service to the own occupation benchmark.  Another referred to only the appellant's "own sedentary level occupation," which strongly suggests a focus on certain physical demands to the exclusion of others (such as fine motor skills) and disregards the cognitive demands of the appellant's own occupation.

occupation (as defined in the plan documents) or some other conception.

Although the administrative record as a whole lends support to the conclusion that neither Aetna nor its reviewers were drawing on a settled articulation of the material duties of the appellant's own occupation as normally performed in the national economy, there is one small fragment that may point in a contrary direction. In the past, the United States Department of Labor published a standard work called the Dictionary of Occupational Titles (DOT), and a claims administrator may properly consider a position description drawn from the DOT in assessing a claim of disability as long as it involves duties comparable to those of the claimant's own job. See Tsoulas v. Liberty Life Assur. Co. of Bos., 454 F.3d 69, 78 (1st Cir. 2006). We have found, buried in the amplitudinous record, an internal assessment by an Aetna employee purporting to correlate the appellant's job description with a position description contained in the DOT.[4]

In the final analysis, this internal assessment is little more than a waif in the wilderness: it is not mentioned by Aetna in its brief, and neither the denial letter itself nor the reviewers' reports ever discussed it. In any event, the record is utterly devoid of any explanation of the Aetna employee's rationale for

---

[4] The complete job description used to conduct this assessment appears nowhere in the administrative record.

selecting that particular position from the DOT's compendium of available job classifications.[5]

Let us be perfectly clear: under an own occupation standard, medical evidence is only part of the equation. See Elliott, 473 F.3d at 618, 623. To assess a claimant's ability to perform his own occupation, a decisionmaker must be aware of, and apply, the requirements of the occupation. See id. at 618. Here, those requirements are measured by how the occupation is normally performed in the national economy — but the claims administrator and the various reviewers seem to have ignored that fact. Because they failed to take such requirements into account, the determination of disability under the plan cannot be said to be reasoned. See id. (concluding that benefits-termination decision was arbitrary and capricious because the administrator "did not rely on an application of the relevant evidence to the occupational standard"); see also Miller v. Am. Airlines, Inc., 632 F.3d 837, 855 (3d Cir. 2011) (concluding in the context of a somewhat different "own occupation" definition that "it is essential that any rational decision to terminate disability benefits

---

[5] For his part, the appellant submitted a vocational assessment in support of his administrative appeal, which identified a different DOT position as most closely analogous to his job. Aetna never acknowledged this facet of the report, nor did it provide a reasoned basis for rejecting the recommended DOT classification.

. . . consider whether the claimant can actually perform the specific job requirements of a position").

It is especially fitting, we think, that Aetna be held to account for this gap in the record. The appellant's claim of continuing disability is tied to the cognitive demands of a high-pressure environment where he was on call 24 hours a day, 365 days a year and responsible for managing systems and employees. That claim is also tied to physical demands specific to this kind of position, such as frequent right-hand use for computing, typing, and writing. On this record, however, no reasonable claims administrator could tell to what extent these matters were or were not integral to the appellant's occupation as that occupation is normally performed in the national economy. Such a claims administrator could only guess — and a determination based on guesswork is the antithesis of a reasoned determination.

There is another reason to hold Aetna strictly to account here. The own occupation standard limned in the plan was not handed down from Mount Olympus. Rather, it was prescribed by Aetna — and having set up the benchmark, Aetna should not be heard to complain when a court holds it to its own prescription.

To say more would be to paint the lily. We hold that Aetna's failure to articulate the contours of the own occupation standard, apply that standard in a meaningful way, and reason from that standard to an appropriate conclusion regarding the

appellant's putative disability renders its benefits-termination decision arbitrary and capricious. See <u>Miller</u>, 632 F.3d at 855; <u>Elliott</u>, 473 F.3d at 618-19. This holding will necessitate further administrative proceedings. After all, this is a close case. As the district court aptly observed, the medical evidence is both voluminous and conflicting. See <u>McDonough</u>, 2014 WL 690319, at \*2. We therefore vacate the entry of summary judgment on the benefits-termination claim and remand to the district court with instructions to remit the matter to Aetna for further review in light of our opinion.[6] See <u>Maher</u> v. <u>Mass. Gen. Hosp. LTD Plan</u>, 665 F.3d 289, 295 (1st Cir. 2011); <u>Buffonge</u> v. <u>Prudential Ins. Co. of Am.</u>, 426 F.3d 20, 31-32 (1st Cir. 2005). We take no view as to the outcome of further proceedings.

## B. **Amount of Penalty**.

This brings us to the appellant's plaint that the district court levied too paltry a penalty for Aetna's tardy disclosure of the policy agreement. Lamenting that Aetna's disclosure was 1,157 days late, the appellant suggests that a penalty amounting to roughly $4 per day is inadequate to serve the deterrent purpose of the penalty statute. Our review of a district court's imposition of penalties under ERISA is for abuse of

---

[6] Were this an instance of a claimant who had been denied benefits to which he clearly was entitled, no remand would be required. See <u>Buffonge</u> v. <u>Prudential Ins. Co. of Am.</u>, 426 F.3d 20, 31 (1st Cir. 2005). But this case is not of that genre.

discretion. See Sullivan v. Raytheon Co., 262 F.3d 41, 52 (1st Cir. 2001); Rodriquez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 588 (1st Cir. 1993).

The controlling statute is 29 U.S.C. § 1132(c)(1)(B), which provides that when an administrator "fails or refuses to comply" with a proper request for plan documents inside 30 days, the court in its discretion may impose a monetary penalty "of up to $100 a day." By a regulation promulgated prior to the events at issue here, the maximum daily penalty was increased to $110 per day. See 29 C.F.R. § 2575.502c-1.

Here, the appellant demanded the plan documents on November 5, 2009. While he received much of the pertinent information promptly, he did not receive the policy agreement until February 4, 2013. The court below determined that Aetna violated the statute by failing to turn over the policy agreement in a timeous manner and imposed a $5,000 penalty. See McDonough, 2014 WL 690319, at *19.

On appeal, Aetna does not gainsay that its late disclosure of the policy agreement violated ERISA.[7] The battle is over the penalty amount.

The district court imposed the challenged penalty in order to "capture Aetna's attention to its statutory obligations." Id. Although the statute and regulations identify a maximum penalty rate for calculating penalties — $110 per day — a deviation from this rate is not (as the appellant implies) a per se abuse of discretion. The statutory/regulatory maximum is a ceiling on the amount of any daily penalty that may be imposed. There is no need for a district court to use a daily rate at all and — as long as the aggregate penalty does not offend the ceiling (days of delay times daily rate) — the amount of the penalty has been left by Congress to the sound discretion of the district court.

All failures to make timely disclosures are not created equal, and we think it fair to infer that Congress intended district courts to consider the totality of the circumstances in fixing a penalty amount. See Kwan v. Andalex Grp. LLC, 737 F.3d

---

[7] We recently held that an insurer not specifically designated as the "plan administrator" in the plan documents may not be treated as "the administrator" within the meaning of ERISA's penalty provision. See Tetreault v. Reliance Std. Life Ins. Co., 769 F.3d 49, 59-60 (1st Cir. 2014) (construing 29 U.S.C. § 1132(c)(1)). Here, however, Aetna represented to the district court (pre-Tetreault) that it, not Biogen, should bear the brunt of any penalty. That representation was accepted by both the appellant and the district court, see supra note 1, and Aetna is bound by it.

834, 848 (2d Cir. 2013); <u>Romero</u> v. <u>SmithKline Beecham</u>, 309 F.3d 113, 120 (3d Cir. 2002); <u>see</u> <u>also</u> <u>Sullivan</u>, 262 F.3d at 52. These circumstances ordinarily will include, at a bare minimum, whether the belated disclosure was in bad faith; whether it caused harm to the opposing party; and if so, the nature and extent of that harm. <u>See</u>, <u>e.g.</u>, <u>Kwan</u>, 737 F.3d at 848; <u>Sullivan</u>, 262 F.3d at 52.

The court below concluded that Aetna's late disclosure was due to "inattentiveness," not bad faith. <u>McDonough</u>, 2014 WL 690319, at *19. The court made no express finding of prejudice, and none is apparent: although the late disclosure implicated the standard of review, the policy agreement was received by the appellant before briefing on summary judgment began.

We need not tarry. A district court is charged with the management of the cases on its docket. Over time, that court develops an understanding of the nuances of a case — an intimate understanding that an appellate court cannot hope to replicate. Given the district court's superior coign of vantage, its hands-on judgment as to the need for a penalty and the quantification of that penalty (if one is needed) is entitled to considerable respect. <u>See</u> <u>United States</u> v. <u>Smithfield Foods, Inc.</u>, 191 F.3d 516, 526-27, 529 (4th Cir. 1999); <u>United States</u> v. <u>Ekco Housewares, Inc.</u>, 62 F.3d 806, 814, 816 (6th Cir. 1995).

This is such a case. In the past, we have affirmed decisions declining to impose <u>any</u> monetary penalty for late

-19-

disclosures of plan documents absent a showing of either bad faith or prejudice.  See, e.g., Kerkhof v. MCI WorldCom, Inc., 282 F.3d 44, 55-56 (1st Cir. 2002); Sullivan, 262 F.3d at 52; Rodriquez-Abreu, 986 F.2d at 588-89.  Especially when considered in light of those decisions, the $5,000 penalty imposed by the court below falls comfortably within the wide encincture of its discretion.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment with respect to the benefits-termination claim is vacated and that claim is remanded to the district court with instructions to remit it to the claims administrator for further proceedings.  The award of a statutory penalty in the amount of $5,000 is affirmed.  The parties shall bear their own costs.

**So Ordered.**