# United States Court of Appeals
## For the First Circuit

No. 22-1824

DAVID A. FIELD,

Plaintiff, Appellant,

v.

SHEET METAL WORKERS' NATIONAL PENSION FUND,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Howard, Circuit Judges.

Hudson Ellis, with whom Eric Buchanan & Associates, PLLC,
were on brief, for plaintiff, appellant.
Nicholas T. Christakos, with whom Peter E. Ball, Ryan M.
Cunningham, Fitch Law Partners, LLP, and Eversheds Sutherland (US)
LLP, were on brief, for defendant, appellee.

October 3, 2023

**LYNCH**, **Circuit Judge**.  David A. Field appeals from the decision of the Massachusetts U.S. District Court denying his motion for summary judgment and granting the renewed motion for summary judgment of the appellee, Sheet Metal Workers' National Pension Fund ("the Fund").  Field v. Sheet Metal Workers' Nat'l Pension Fund, No. 1:20-CV-11939-IT, 2022 WL 4626883 (D. Mass. Sept. 30, 2022).  Field brought suit for plan benefits pursuant to ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), arguing that the Fund wrongfully terminated his previously granted Disability Benefit.  The District Court held that the Appeals Committee of the Board of Trustees of the Fund ("Appeals Committee") did not abuse its discretion and was not arbitrary or capricious in terminating his Disability Benefit payments based on the Committee's findings that Field had engaged in Disqualifying Employment in 2016 and also that he had not completed sufficient hours of Covered Employment to become eligible for this benefit in the first place.  We need reach only the first of the Committee's findings because it is dispositive.

Field argues that the Appeals Committee acted arbitrarily and capriciously and abused its discretion in determining that he had engaged in Disqualifying Employment in 2016 on the grounds that, in his view, the Committee failed to meaningfully engage with the evidence he submitted.

We affirm the district court's entry of summary judgment for the Fund.

**I.**

**A.**

The Fund is a multiemployer pension plan falling under 29 U.S.C. § 1002(37)(A) administered by the Board of Trustees, which is a plan "fiduciary" within the meaning of 29 U.S.C. § 1002(21)(A). Participants in the Fund's Plan ("Plan") are eligible for benefits pursuant to the provisions of the Fund's Plan Document ("Plan Document"). Under § 1.13 of the Plan Document, an individual hired or rehired before July 1, 2001, who performs work covered by a collective bargaining agreement for a "Contributing Employer" can become eligible for Plan benefits as a "Covered Employee." Section 1.10 of the Plan Document defines a "Contributing Employer" as an industry employer who is party to a Collective Bargaining Agreement with the SMWIA[1], or any local union ("Local") chartered by it, that requires periodic contributions to the Fund and who participates in the Plan in accordance with Article 2 of the Plan Document. Contributing Employers report hours of service and contribute payments to the

---

[1] Here, "SMWIA" means "the Sheet Metal Workers' International Association, AFL-CIO, or the International Association of Sheet Metal, Air, Rail and Transportation Workers," except its Transportation Division or any affiliate thereof, according to § 1.36 of the Plan Document.

- 3 -

Fund for "Covered Employment," meaning "work performed by an Employee on behalf of one or more Contributing Employers in his capacity as a Covered Employee" under § 1.14 of the Plan Document. The Fund credits these employer-reported hours to its Covered Employee participants to determine whether they are eligible for pension benefits under the Plan.

Field became a member of SMART Local Union 17 in Dorchester, Massachusetts, a Participating Local, in 1981 and remains a retired member. As a member of a Participating Local, he is a Plan Participant eligible for benefits should he meet the Plan Document's requirements. Under § 16.03 of the Plan Document, to become eligible for a Disability Benefit -- formerly known as a Disability Pension[2] -- a Plan Participant must accumulate at least ten years of "Pension Credit" -- meaning Covered Employment under the Plan either before or after their employer became a Contributing Employer -- among other requirements.

_____

[2] The parties appear to use the terms "Disability Pension" and "Disability Benefit" interchangeably. See, e.g., the July 29, 1993, and February 7, 1995, letters from the Fund to Field (referring to Field's "Disability Pension"); the October 12, 2011, and July 11, 2019, letters (referring to his "Disability Benefit"); the September 20, 2019, letter from Field to the Fund (referring to his "Disability Pension"). See also Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 19 (in which the Fund "dispute[d] that Field satisfied the eligibility requirements to receive a Disability Pension (or Disability Benefit as it was later called) under the Plan Document.") (emphasis added). Thus, we do not distinguish between these terms.

If at any time a Disability Benefit recipient performs any "Disqualifying Employment" -- defined under § 8.06(d)(1) of the Plan Document as "(A) employment with any Contributing Employer; (B) employment with any employer in the same or related business as any Contributing Employer; (C) self-employment in the same or related business as a Contributing Employer; (D) employment or self-employment in any business which is under the jurisdiction of the Union; or (E) employment in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer" -- § 16.06(b)(3) of the Plan Document dictates that their Disability Benefit will be terminated.

Section 8.02 of the Plan Document requires Plan participants to "furnish the Fund Office with any information or proof requested by it and reasonably required to administer the Plan." If the claim or information provided is "materially inaccurate," or the information provided is incomplete, "benefits may be denied, suspended, or discontinued." Id. The Fund also reserves "the right to recover any benefit payments made in reliance on any materially inaccurate or incomplete statement, information or proof." Id.

Section 8.03 of the Fund's Plan Document gives the Trustees "the sole and absolute power, authority and discretion to determine . . . the application and interpretation of the Plan Document" and "entitlement to or amount of a pension." Pursuant

to § 8.03(b) of the Plan Document, the Trustees have delegated this power to an Appeals Committee. Under § 8.04 of the Plan Document, the Appeals Committee's decision on matters within the range of this delegated authority is "final and binding."

**B.**

In May 1993, Field applied for a Disability Pension, asserting he was disabled due to electrocution, herniated discs, and Crohn's disease and thus unable to work in the sheet metal industry. In a July 29, 1993, letter, the Fund informed Field that he was ineligible to receive a Disability Pension due to insufficient Pension Credit. Field appealed this denial on September 8, 1993, arguing that the Fund should credit him additional hours of Covered Employment and stating that the last time he was and would "ever be gainfully employed, due to [his] medical and physical condition" was January 17, 1991, "due to a serious electrocution suffered at the JFK Federal Building." In a November 17, 1993, letter, the Fund denied Field's appeal because he was still ineligible due to insufficient Pension Credit. Field's father, Bud Field, owner of union contractor Field Fabrication Corporation, then provided several letters attesting that Field had worked additional hours at his company in 1982, 1987, 1990, and 1991 that had not been included or credited by the Fund in his initial disability application and paid corresponding pension contributions. Field reapplied for a Disability Pension

- 6 -

on January 31, 1995.  The Fund approved his application for a Disability Pension in February 1995.  The Fund repeatedly notified Field over the following years that if he "return[ed] to any work in Disqualifying Employment (paid or unpaid) [his disability] benefit w[ould] be immediately terminated."

## C.

In a July 11, 2019, letter, the Fund informed Field that his Disability Benefit had been terminated as of August 1, 2008, and he was required to reimburse the Plan for payments he had received from the Fund since that date, because the Fund had information that he had engaged in Disqualifying Employment.  The Fund wrote that Field held a Home Improvement Contractor license in the Commonwealth of Massachusetts and owned David Field Construction, a company "advertised as a general contractor."  It had also "verified that [Field] w[as] responsible for" four construction projects on August 13, 2008; May 14, 2010; February 19, 2016; and April 20, 2016.  The Fund "determined that the work [he] performed me[t] the Plan's definition of work in both the Sheet Metal Industry and Disqualifying Employment."

The letter informed Field that he had the right to appeal this decision to the Appeals Committee within 180 days of its receipt and that "the Appeals Committee has full discretion to interpret the Plan, and its decision is final and binding."  The letter also stated, "[i]t is your obligation in any appeal to

provide the Appeals Committee with any and all evidence, or other information, supporting your position" and "[r]efusing or failing to provide any necessary information can result in the denial of benefits."

Field appealed to the Appeals Committee on July 15, 2019, arguing as to the Disqualifying Employment in 2008 and 2010 that he was not responsible because these projects had been performed by a different person. As to the Disqualifying Employment in 2016, he asserted that the two projects were "NEVER PERFORMED AND *1*OR [sic] SUPERVISED BY ME." He stated that he had contacted Boston Inspectional Services and was informed that a building permit had been issued under his Construction Supervisor and Home Improvement licenses and that his "LICENSED [sic] WAS USED BY JUA [sic] P QUISHPILEMA OF 353 PLEASANT STREET, BROCKTON, MA 02301 PHONE # 508-588-5397 WHO PERFORMED THE WORK IN THE ABOVE 2 ISSUED PERMITS." He also asserted that he had "RECEIVED NO INCOME AND/OR BENEFIT" from Quishpilema's use of his license number and that he had "INFORMED THE CITY OF BOSTON TO BLOCK ANY PERMITS UNDER [his] LICENSE NUMBER AND OR NAME TO BE ISSUED [with]OUT [him] BEING THERE IN PERSON," as well as "INSTRUCTED MR. J. QUISHPILEMA TO NEVER AGAIN USE [his] INFORMATION." In addition, he stated he had not even been present in Massachusetts when the 2016 projects were performed because he had been in Florida recuperating from a surgery on his right hand for carpal tunnel syndrome. He

acknowledged that he had continued to maintain his Massachusetts Construction Supervisor, Home Improvement Contractor, and Master Sheet Metal licenses but claimed he did not produce any income or benefits from them.[3]

On September 16, 2019, the Fund informed Field that it had "verified . . . that [he] currently hold[s] or ha[s] held" Massachusetts Master Sheet Metal, Construction Supervisor, and Home Improvement licenses.[4] The Fund asked him to "provide details of the permits that have been issued to you and describe under what circumstances would you be present to obtain a license" and

---

[3] Field stated in a letter to the Fund on December 5, 2019, that he maintained these three Massachusetts professional licenses because he had been instructed to do so by Charles Geary, President of Local union 17, and James Wool, Business Manager of Local union 17, "IN CASE I AM EVER HEALTHY ENOUGH TO RETURN TO MY UNION JOB I HELD SINCE 1981."

[4] In its September 16, 2019, letter, the Fund also stated that Field had held State of Florida Standard Plans Examiner and Standard Inspector (mechanical) licenses from May 4, 2000, through November 30, 2005, and May 4, 1994, through November 30, 2005, respectively. On September 20, 2019, Field denied having ever held these licenses, stating he had only ever held "A 3 MONTH SNOW BIRD LICENSE FOR A 2 TO 3 MONTH PERIOD IN 2005" and that "NO OTHER LICENSES WHERE [sic] EVER HELD BY ME," and asked the Fund to "PLEASE RE-INVESTIGATE THIS." On October 31, 2019, the Fund again requested information from Field about "what is required to obtain and maintain all of the above referenced licenses," referring to a list which included the Florida licenses. On November 14, 2019, the Fund, following up on a conversation with Field on November 12, 2019, acknowledged that these licenses belonged to "a different David Field with a different birthdate."

- 9 -

"information as to what is required to obtain and maintain all of the above referenced licenses."

Field responded on September 20, 2019, "CLAIM[ing] A DEFENSE OF STATUTE OF LIMITATIONS" to the Fund's first request. In response to the Fund's second request, he listed his three Massachusetts professional licenses and stated "A FEE OF $100 EVERY 2 YEARS FOR EACH OF THE ABOVE STATED LICENSE" before arguing that having these licenses did not disqualify him from his benefits.

The Fund wrote again on October 31, 2019, acknowledging that the 2008 and 2010 projects had been performed by another person[5] but stating, "we continue to have questions concerning the work performed on April 20, 2016 [that] remain[] unanswered." The Fund reiterated that it had requested that Field "provide details of the permits that have been issued to [him] and describe under what circumstances would [he] be present to obtain a license." The Fund stated that it was "reviewing [his] continued eligibility due to the fact that [he] continue[s] to carry several licenses . . . all of which, if utilized, would be work in Disqualifying Employment" before noting that Field had "not provided the requested information as to what is required to obtain and

---

[5] The Appeals Committee did not consider these instances in its determination that Field had engaged in Disqualifying Employment.

- 10 -

maintain" his professional licenses.[6]  On November 14, 2019, the Fund again requested "additional information about [his] Construction Supervisor and Home Improvement licenses and [his] interaction with JQ Construction and Jua[n] P. Quishpilema" that had been previously requested in its October 31, 2019, letter, which Field had failed to provide.

On December 1, 2019, Field wrote that he did "NOT HAVE ANY OTHER INFORMATION REGARDING THE [February and April 2016] PERMITS" issued to Quishpilema.  Then on December 5, 2019, Field wrote a letter to the Fund in which he provided a statement that he purported to be an "affidavit"[7] from Quishpilema, which reads as follows:

> I JUAN P QUISHPILEMA OWNER OF JQ CONSTRUCTION LOCATED AT 353 PLEASANT STREET, BROCKTON, MA. 02301 HEREBY STATE THAT ON OR ABOUT FEBRUARY 19, 2016. [I] REPAIRED SECTION OF A ROOF BOAJWING [sic] NOT DONE BY PREVIOUS CONTRACTOR.  MY CREW ALSO TOOK DOWN PART OF A NONFUNCTIONAL CHIMNEY, INSTALLED A RIDGE VENT

---

[6]    The Fund also notified Field that it had discovered evidence of two other possible instances of Field engaging in Disqualifying Employment -- as suggested by litigation brought by the Town of Whitman, Massachusetts, against him, and pictures posted on Facebook showing him on location at different work sites and venues -- and requested explanations of why these instances did not constitute Disqualifying Employment.  After additional correspondence with Field the Appeals Committee did not rely on these instances in its determination that Field had engaged in Disqualifying Employment.

[7]    Although Field described this document as an "affidavit," Field's counsel at oral argument admitted that this statement, being unsworn and unnotarized, "would be more properly termed a statement or a declaration than an affidavit."

NOT DONE BY PREVIOUS CONTRACTOR, REMOVE & REPLACE SOFFIT VENTS INSTALLED INCORRECTLY. WE ALSO REPAIRED SOFFIT VENTS FOR CODE UPGRADES. THIS WAS A ONE DAY REPAIR & CODE UPGRADES. I USED DAVID A FIELD CONSTRUCTION SUPERVISOR & HIC LICENSE TO OBTAIN A PERMIT WITHOUT MR FIELD AUTHORIZATION & PERMISSION[.]

IN ADDITION TO THE ABOVE WORK I ALSO WITHOUT AUTHORIZATION & PERMISSION USED MR DAVID A FIELD CONSTRUCTION SUPERVISOR & HIC LICENSE TO OBTAIN A ROOFING PERMIT ON OR ABOUT APRIL 20, 2016[,] FOR REPLACEMENT OF A NEW SMALL 9 1/2 SQUARE ROOF AT 6 SAXTON STREET, BOSTON, MA[.] [T]HIS WAS A ONE DAY INSTALLATION[.]

I HAVE BEEN INFORMED BY INSPECTIONAL SERVICES & DAVID A FIELD TO NEVER AGAIN ATTEMPT TO USE ANYONE[']S LICENSE[.]

THE ABOVE STATEMENT IS TRUE AND I HAVE SIGNED FREELY BY MY OWN FREE WI[LL]. I PROMISE UNDER THE PAINS AND PENAUTIES [sic] OF PERJURY TO EVER [sic] AGAIN USE MR DAVID A FIELD LICENSE[.]

IF I COU[LD] BE OF FURTHER ASSISTANCE PLEASE FEEL FREE TO CONTACT ME.

The Fund sent a letter addressed to Quishpilema on February 19, 2020, to the address provided in the statement notifying him that the Fund had received the statement (which it enclosed in the letter), stating "[w]e would like to ask you a few questions concerning your use of [Field's] license," providing contact information, and asking him to contact the Fund "to discuss your availability to meet with us." The Fund never received a response from Quishpilema.

On April 1, 2020, the Fund wrote to Field asking for Quishpilema's contact information -- which it had previously

- 12 -

"requested in our January and March correspondence[s]" -- in order to "request additional information from [him]." Also on April 1, 2020, Field responded that he believed Quishpilema "may have RELOCATED TO ECUADOR" and that he did not know how to contact him.

**D.**

On April 11, 2020, the Fund sent Field a letter informing him that the Appeals Committee had determined that his Disability Benefit should be terminated on the two independent grounds described earlier: that Field had engaged in Disqualifying Employment in 2016 and that he had not completed sufficient hours of Covered Employment to become eligible for this benefit in the first place. In this letter, the Fund wrote to Field:

> The Committee reviewed the Fund Office's termination of your Disab[i]lity Benefit based on what it had identified as Disqualifying Employment because it was work in the Sheet Metal Industry as described in the SMART Constitution & Ritual Sections 5(c), (d), and (e) and work in a related building trade. The Committee noted that you have not disputed that the identified work was Disqualifying Employment but rather have stated that you did not perform such work. The Committee reviewed the information that you provided concerning the use of your Construction Supervisor license in February and April 2016 and the information concerning possible other work in Disqualifying Employment. The Committee was unpersuaded that your Construction Supervisor's license was used without your knowledge based on their knowledge of licensing in the construction industry and based on the information that you provided. It noted that Section 8.02 of the Plan Document states that a participant must

- 13 -

provide information requested and reasonably required to administer the Plan and that benefits may be denied if a participant furnishes "incomplete information or proof relative to eligibility or continued eligibility . . . [.]" Despite repeated requests, however, you have failed to provide any additional documentation beyond the single statement from Juan Quishpilema. Therefore, the Committee deemed that it was bound by the terms of Section 8.02 of the Plan Document to deny your appeal because (1) you have not provided any credible documentation to support your claim that your Construction Supervisor license was twice used fraudulently and that you had maintained eligibility to receive the Disability Benefit, and (2) that your failure to provide such documentation or other credible evidence, despite repeated requests, created an adverse inference suggesting that you yourself used your Construction Supervisor license or, at the least, that it was used with your knowledge and consent, either of which provides a sufficient basis to terminate your Disability Benefit. Accordingly, the Committee determined that you were no longer entitled to receive the Disability Benefit beginning in February 2016 as a result of the Disqualifying Employment and that $33,809, plus interest is due to the Fund for payments made on and after March 1, 2016.

The letter also notified Field of his right to file an action under ERISA Section 502(a) to challenge the Appeals Committee's decision in a court of law.

## II.

Field filed this suit under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) on October 28, 2020. Parties filed cross motions for summary judgment on September 17, 2021. The district court then ordered the Fund to submit a renewed motion for summary

- 14 -

judgment to correct a mistake in the first motion, which the Fund did on November 12, 2021. The district court heard oral argument on June 29, 2022, and issued its twenty-six-page Memorandum and Order ruling for the Fund on September 30, 2022. See Field, 2022 WL 4626883. Field filed a timely appeal.

We review de novo a district court's grant of summary judgment on challenges to a benefit plan's denial of benefits under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). See Arruda v. Zurich Am. Ins. Co., 951 F.3d 12, 21 (1st Cir. 2020). Where, as here, the plan administrator is given discretionary authority to determine benefits eligibility and interpret plan provisions, a court must defer to the plan administrator where its "decision is reasonable and supported by substantial evidence on the record as a whole." Id. (quoting McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015)).

### III.

Field argues that the Fund's decision that he had engaged in Disqualifying Employment was arbitrary and capricious because the decision failed to "engage with the evidence that [he] submitted in a meaningful way." We disagree. "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004). "[I]n the presence

- 15 -

of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion." Id. at 216. Section 8.03 of the Plan Document grants the Appeals Committee this discretion to determine "the application and interpretation of the Plan Document" and "entitlement to or amount of a pension." Thus, the Committee's determination that Field had engaged in Disqualifying Employment after weighing the conflicting evidence in this case is not arbitrary, capricious, or an abuse of discretion.

Field argues that "the Fund did not generate any evidence supporting its conclusion that [he] engaged in Disqualifying Employment," claiming that "[t]he only evidence that exists in the record about whether [he] performed Disqualifying Employment is the evidence that [he] produced in the form of an affidavit." This claim is false. The Administrative Record shows that Field's Construction Supervisor and Home Improvement licenses were used to obtain permits for two construction projects in February and April 2016, which the Fund determined constituted Disqualifying Employment under the Plan Document. The Appeals Committee considered this evidence alongside the single piece of evidence Field presented to rebut this claim: a statement purporting to be from Quishpilema asserting that he had used Field's license to obtain permits for the February and April 2016 projects without Field's permission. This statement was undated, unnotarized, and

not written on the letterhead of any company, much less that of JQ Construction, the company Quishpilema purportedly owned. Field failed to provide additional evidence for why the use of his licenses to obtain permits for the two 2016 construction projects did not constitute Disqualifying Employment, despite the Fund's repeated inquiries on September 16, 2019; October 31, 2019; November 14, 2019; and April 1, 2020. This evidence is "reasonably sufficient to support [the Appeals Committee's] conclusion," Gannon, 360 F.3d at 213, that Field engaged in Disqualifying Employment.

Field also argues that the Fund "could have done its own research" to develop evidence regarding the veracity of Field's claim, but instead it "did not develop any new information during its internal review process." This too is false. After its repeated attempts to acquire additional information from Field, the Fund tried to independently verify the statement Field had provided by sending a letter requesting more information to Quishpilema on February 19, 2020. When this letter went unanswered, the Fund attempted three times -- in January, March, and April 2020 -- to obtain contact information for Quishpilema from Field "so that [it] could request additional information from [Quishpilema]." Further, under § 8.02 of the Plan Document, Field bore the responsibility for providing "any information or proof requested by [the Fund] and reasonably required to administer the

Plan."  He was notified in the Fund's July 11, 2019, benefits termination letter that "[i]t is [his] obligation in any appeal to provide the Appeals Committee with any and all evidence, or other information, supporting [his] position" and "[r]efusing or failing to provide any necessary information can result in the denial of benefits."  Given the deficiencies of the Quishpilema statement, Field's failure to provide additional evidence that he had not engaged in Disqualifying Employment despite the Fund's repeated requests and Field's obligation to do so under § 8.02 of the Plan Document, and the Fund's inability to independently confirm the veracity of Field's claim, we hold that the Committee acted reasonably and with "support[] by substantial evidence on the record as a whole," Arruda, 951 F.3d at 21 (quoting McDonough, 783 F.3d at 379), when it determined that Field had "not provided any credible documentation to support [his] claim that [his] Construction Supervisor license was twice used fraudulently and that [he] had maintained eligibility to receive the Disability Benefit."

## IV.

We **affirm** the well-reasoned decision of the District Court.  Costs are awarded to the Fund.